**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |  |
|---|---|---|
| | * | |
| **FELICIA STROTHERS,** | | |
| | * | |
| **Plaintiff,** | | |
| | * | |
| **v.** | | **Case No.: PWG-14-3594** |
| | * | |
| **CITY OF LAUREL, MARYLAND,** | | |
| | * | |
| **Defendant.** | | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

Following the termination of her employment as an Administrative Assistant II in Defendant City of Laurel, Maryland (the "City")'s Communications Department, Plaintiff Felicia Strothers filed suit in the Circuit Court for Prince George's County, alleging racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, and claiming state-tort damages. *See* Compl. ¶¶ 5, 9, ECF No. 2. After the City removed the case to this Court, ECF No. 1, I dismissed all of Strothers's claims except for the retaliation claim, ECF No. 21. The City now moves for summary judgment on the sole remaining claim, arguing that Strothers has failed to establish a *prima facie* retaliation case and that she failed to demonstrate that its legitimate non-retaliatory reason to terminate her employment for tardiness was pretextual. ECF No. 56. The Motion is fully briefed, Def.'s Mem., ECF No 56-1; Pl.'s Opp'n, ECF No. 57; Def.'s Reply, ECF No. 58, and no hearing is necessary, Loc. R. 105.6 (D. Md.). Because Strothers's complaints prior to her termination gave the City no notice that she was opposing racial discrimination, I will grant the City's Motion.

## Background

Strothers, a black woman, worked, on a probationary basis, as an Administrative Assistant II in the City's Communications Department from October 2013 until March 2014. Offer Letter, J.A. 104; Termination Letter, J.A. 187–88; City of Laurel, Maryland Employee Processing Form, J.A. 103.[1]  Strothers's offer letter designated her working hours as 9:00 A.M. until 5:00 P.M, Monday through Friday.  Offer Letter, J.A. 104.  City employees must comply with a strict attendance policy, which defines more than one late arrival per quarter as an "indicat[ion] of poor attendance habits and poor performance" and instructs an initial late arrival to be sanctioned by a warning followed by progressive discipline for subsequent offenses.  City of Laurel, Maryland Human Resource Policy on Attendance, 4-007.01 (Feb. 5, 2003) [hereinafter Attendance Policy], J.A. 231; *see also* City of Laurel, Maryland Human Resources Policy on Disciplinary Actions, 5-003.00 (July 12, 1994) [hereinafter Disciplinary Policy], J.A. 226–30.

In light of this policy, when Communications Director Peter Piringer called to offer Strothers the job, she expressed concern about her ability to be in the office on time because her children's school bus did not pick up until shortly before 9:00 A.M., and it took her around ten minutes without traffic to drive from the bus stop to the office.  Strothers Dep. 28:4–11, J.A. 8; Piringer Dep. 20:5–7, J.A. 32; Memorandum from Felicia Strothers to Peter Piringer (Dec. 13, 2013) [hereinafter Strothers Dec. 13, 2013 Memorandum], J.A. 140.  Piringer gave Strothers some initial leeway, allowing her to arrive by 9:05 A.M. and make up any missed time during lunch.  Piringer Dep. 19:19–22, J.A. 32.  Strothers was instructed to report to Community Services Officer Carreen Koubek on her first day of work, Offer Letter, J.A. 104, at which time

---

[1] Citations to J.A. refer to the Joint Appendix that the parties submitted in the case, which appears at ECF No. 59-1.

Strothers informed Koubek of her arrangement with Piringer, Strothers Dep. 29:7–12, J.A. 8; Koubek Dep. 56:14–57:1, J.A. 119–20.  Koubek did not object to the arrangement but, by her account, indicated that Strothers would have to make alternative arrangements and begin arriving by 9:00 A.M. within two weeks and later agreed to give Strothers an additional two weeks after consulting with Piringer.  Koubek Dep. 57:2–10.  By Strothers's account, from the beginning, Piringer gave her until Veterans Day (November 11, 2013)—four weeks after her start date—to make alternative arrangements.  Strothers Dep. 30:8–19.  Piringer and Koubek agree, however, that they ultimately gave Strothers approximately four weeks to make the necessary arrangements to be at work by 9:00 A.M.

At some point, Koubek began to take issue with Strothers's tardiness and started memorializing her arrival times in a document that she refers to as a journal.  Koubek Dep. 59:13–18, J.A. 120 ("I created this document because I'd been having the tardiness issues, the attitude issues.  It was getting worse as time went on, and I was directed by HR to document.").  Although the document is dated November 25, 2013 (i.e. two weeks after Veterans Day), the document tracks Strothers's arrival times beginning on her October 7 start date.  Memorandum from Carreen Koubek to Peter Piringer (Nov. 25, 2013) [hereinafter Koubek Memorandum], J.A. 134–39.  During the first month of Strothers's employment, Koubek recorded two dates (October 21 and October 28) when Strothers arrived later than 9:05 A.M., and several days when she arrived before 9:00 A.M.  *Id.* at J.A. 134–37.  At her deposition, Koubek testified that she documented Strothers's on-time arrivals as well as her late arrivals because she "wanted to be fair," Koubek Dep. 64:19–65:5, J.A. 121–22, but the journal entries appear critical of any arrival time after 8:55 A.M., even during the grace period, *see, e.g.*, Koubek Memorandum, J.A. 135 ("**October 8, 2013** – Arrival time computer stamped at 8:59am.  From **Journal Entry**: Spoke

with Felicia about her arrival time. . . . I told her that getting here at 9am or after can't happen."). Koubek also intimated that, despite what Strothers's offer letter stated and despite being permitted to arrive by 9:05 until Veterans Day, she was expected to be at her desk by 8:50 A.M. or 8:55 A.M. at the latest. *Id.*, J.A. 135 ("I told her that neither Pete [Piringer] nor myself set the start times for the day. That is the Administration and the Administration says if you are not at your desk by 10 minutes before your start time you were late. I told her I had spoken with [the City Administrator's] Office and they had no problems with a 5 minutes prior to start time."). City Administrator Kristie Mills testified in her deposition that she had "an expectation" that employees be at work five to ten minutes early. Mills Dep. 68:7–69:7, J.A. 95–95.

Strothers continued to struggle to arrive on time after Veterans Day. Koubek Memorandum, J.A. 137–39 (documenting arrivals after 9:00 A.M. on November 12–15, 18, and 25, 2013); Strothers Dec. 13, 2013 Memorandum, J.A. 142–44 (disputing only the November 15 arrival time). Despite this, none of Koubek's superiors took disciplinary action authorized by the City's Attendance Policy against her. Greene Dep. 46:5–17, J.A. 58; *see also* Attendance Policy, J.A. 231 (prescribing progressive discipline for tardiness); Disciplinary Policy, J.A. 227–28 (delineating progressive discipline beginning with a written warning, escalating to one- and then three-day suspensions, and culminating in termination). In January 2014, Koubek gave Strothers a three-month performance evaluation in which she rated her attendance "unsatisfactory," noting that she was "[c]onsistently late to work" and also gave her unsatisfactory marks in other performance categories.[2] Strothers Performance Evaluation, J.A. 150–51. Strothers noted her

---

[2] The record contains much discussion of dissatisfaction among Koubek and other City employees with Strothers's work. But the City does not assert Storthers's substantive job performance as a legitimate non-retaliatory reason for her dismissal. Def.'s Mem. 5 ("The City consistently has stated the reason Ms. Strothers was released was because of her excessive tardiness. Other reasons, including poor work performance and insubordination, arguably would

4

disagreement with the evaluation on the form and specifically challenged the expectation that she

arrive at work before 9:00 A.M., given that she received no written policy to that effect.  *Id.* at

J.A. 151.  The evaluation provided fields for department director review and approval that were

left blank.  *Id.*  Strothers immediately inquired into how she could formally contest the

evaluation, and Koubek informed her that Human Resources (HR) Director Mike Greene advised

that she file a grievance with HR.  Email from Carreen Koubek to Felicia Strothers (Jan. 6, 2014,

4:37 P.M.), J.A. 152.  Three days later, Strothers filed a grievance contesting the evaluation in

general terms and specifically the criticisms of her substantive performance, while also noting

that the form had not been signed by the Peter Piringer.  Jan. 9, 2016 Grievance, J.A. 157–59.

The City took no action in response to the grievance.  Strothers Dep. 52:21–53:19.

The following month, Koubek verbally reprimanded Strothers in the hallway and within

earshot of other employees for wearing pants on a Friday that she perceived to be leggings.

Strothers Dep. 56:10–57:16, J.A. 15.  Although City employees are permitted to wear jeans on

Fridays, leggings are impermissible.  Koubek Dep. 86:15–18, J.A. 127.  Strothers insisted that

the pants were in fact jeans and stretched the pants material to demonstrate its jeans-like

properties.  Memorandum from Felicia Strothers to Peter Piringer (Feb. 26, 2014) [hereinafter

Strothers Feb. 26, 2014 Memorandum], J.A. 163; Koubek Dep. 90:7–8, J.A. 128.  Without

Strothers's consent, Koubek grabbed Strothers's pants to feel the fabric for herself and reasserted

her belief that they were leggings.  Strothers Dep. 60:2–5, J.A. 16; Koubek Dep. 90:8–19, J.A.

128 ("She did not [tell me to reach down and pull her cuff], no.  No, but I figured – I wanted to

feel the material.  She was feeling it.  I wanted to, you know.").  Upset by Koubek's conduct,

Strothers immediately called Piringer and left a voicemail about the incident and sent him a

---

have justified her release as well, but were not the reasons stated by the City.").  Accordingly, I
will not recite the facts pertaining to her job performance that are unrelated to her tardiness.

memorandum five days later in which she recounted the confrontation and said that she "did not feel welcome by [Koubek]" since the beginning of her employment and complained that "[t]he stress and harassment has become unbearable, making it difficult to come into the office." Strothers Feb. 26, 2014 Memorandum, J.A. 163–65. Although not submitted on a grievance form, the memorandum conformed with the City's procedures for reporting harassment. City of Laurel, Maryland Human Resources Policy on Grievance Procedures, 6-001.03, at 2 (Nov. 2, 2010), J.A. 235 ("Employees who have job related problems, questions or complaints shall bring their concerns, in writing, to their immediate supervisor. . . . In the event that the grievance is about an action taken by the immediate supervisor, the grievance shall be filed with the next higher supervisor within their chain of command that is not a subject of the grievance."); *see also* Discrimination Policy 2, J.A. 238. On the ensuing Friday, Kristie Mills reprimanded Strothers for wearing a similar pair of pants that she deemed "too tight." Strothers Dep. 62:14–65:10, J.A. 17; Mills Dep. 76:13–77:7, J.A. 95–96. Strothers emailed Piringer to inform him of the second pants-related incident. Email from Felicia Strothers to Peter Piringer (Feb. 28, 2014, 1:25 P.M.), J.A. 167.

One week later, the City terminated Strothers for tardiness. Termination Letter, J.A. 187–88. Shortly thereafter, Strothers filed formal grievance contesting her termination and requesting reinstatement under a different direct supervisor. Mar. 12, 2014 Grievance, J.A. 189–98. In the grievance, she again complained that Koubek had "harassed" her and recounted her efforts to notify Piringer about Koubek's conduct. *Id.* at J.A. 196. She also indicated for the first time a belief that Koubek's behavior towards her was motivated by racial animus. *Id.* at 197 ("No other employee of another race, also on probation was spoken to regarding their attire . . . ."). The City treated the grievance as an "Appeal of Release from Probationary

6

Employment" and held an appeal hearing attended by City Administrator Mills and HR Director Greene.  Letter from Kristie Mills to Felicia Strothers (Mar. 25, 2014), J.A. 199–200.  Mills and Greene upheld the release, reiterating that Strothers was terminated for tardiness.  *Id.* at 199. Strothers appealed the decision to Mayor Craig Moe, Letter from Felicia Strothers to Mayor Craig A. Moe, City of Laurel, Md. (Apr. 15, 2014), J.A. 202–11, reiterating her charge of racial harassment, *id.* at J.A. 203, 206, and complaining of a "hostile environment," *id.* at 207.  Mayor Moe upheld the termination and also emphasized that Strothers was released for tardiness.  Letter from Mayor Craig Moe to Felicia Strothers (May 5, 2014), J.A. 212–13.

Having unsuccessfully appealed her termination, Strothers filed a complaint with the U.S. Equal Employment Opportunity Commission (EEOC), EEOC Compl., J.A. 201, which issued Strothers a right-to-sue letter, EEOC Dismissal and Notice of Rights, Supp. Compl. Ex. 1, ECF No. 13-2.  Strothers filed suit in the Circuit Court for Prince George's County, alleging discrimination and retaliation under Title VII and claiming state-tort damages.  Compl. ¶¶ 5, 9.  I dismissed the discrimination and tort claims, leaving only the retaliation claim, ECF No. 21, which is the subject of the City's Motion for Summary Judgment, Def.'s Mem. 4.

## Standard of Review

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a), (c)(1)(A); *see also Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013).  If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to

the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id.*

## Discussion

Section 704(a) of Title VII "prohibits an employer from taking an adverse employment action against any employee 'because he has opposed any practice made an unlawful employment practice." *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005) (quoting Title VII § 704(a), 42 U.S.C. § 2000e-3(a)). When the record lacks direct evidence of retaliation, as is the case here, the plaintiff may prove that retaliation occurred using the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004), *abrogated on other grounds by Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243 (4th Cir. 2015). Under "the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie* case of retaliation, whereupon the burden shifts to the employer to establish a legitimate non-retaliatory reason for the action. If the employer sets forth a legitimate, non-retaliatory explanation for the action, the plaintiff then must show the employer's proffered reasons are pretextual or his claim will fail." *Id.* To establish a *prima facie* case of retaliation, the plaintiff must prove: " '(1) that she engaged in a protected activity,' as well as '(2) that her employer took an adverse employment action against her,' and '(3) that there was a causal link between the two events.' " *Boyer-Liberto v. Fountainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2016) (en banc) (quoting *Navy Fed. Credit Union*, 424 F.3d at

405–06).  The City contends that Strothers has failed to meet her burden of production as to either the first or third elements.  Def.'s Mem. 22.

Protected activity includes "participating in an ongoing investigation or proceeding under Title VII" or "opposing discriminatory practices in the workplace," *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998), only the latter of which Strothers contends was the basis for her termination, Pl.'s Opp'n 15.  To amount to protected activity, the employee must "actually oppose[] employment practices made unlawful *by Title VII*," which does not include "practices the employee simply thinks are somehow unfair" or even "all unlawful employment practices." *McNair v. Comput. Data Sys., Inc.*, 172 F.3d 863, 1999 WL 30959, at *5 (4th Cir. Jan. 26, 1999).  That said, "[S]ection 704(a) protects activity in opposition not only to employment actions *actually unlawful* under Title VII but also employment actions an employee reasonably believes to be unlawful" under the statute.  *Navy Fed. Credit Union*, 424 F.3d at 406 (emphasis added).  The Fourth Circuit "has articulated an expansive view of what constitutes oppositional conduct, recognizing that it 'encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities.' " *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015).

It is clear that Strothers did oppose Koubek's treatment of her prior to being terminated. *See* Jan. 9, 2014 Grievance, J.A. 157–59; Strothers Feb. 26, 2014 Memorandum, J.A. 163–65. But she provides scant evidence that she believed that Koubek's behavior towards her was rooted in racial animus or that such a belief would have been reasonable.  It certainly appears that Koubek was on Strothers's case from the beginning of her employment.  Despite acknowledging that Piringer allowed Strothers to arrive by 9:05 A.M. for the first month of her tenure, Koubek

Dep. 57:2–10, Koubek meticulously documented any time Strothers arrived after 8:55 A.M. but before 9:05 A.M. in addition to two instances during the first month when she arrived after 9:05 A.M, Koubek Memorandum, J.A. 134–37.   On at least one occasion, Koubek reprimanded Strothers for arriving at 8:59 A.M. during the grace period.  *Id.* at 134.  Koubek also confronted Strothers about her attire in an inappropriate manner, impermissibly touching Strothers's clothing without her consent.  Koubek Dep. 90:8–19, J.A. 128.  Not unreasonably, Strothers characterizes Koubek's admitted conduct as battery.  Pl.'s Opp'n 17; *see also Robinson v. Cutchin*, 140 F. Supp. 2d 488, 492 (D. Md. 2001) ("A battery is the intentional touching of a person without that person's consent.  Touching includes the intentional putting into motion of anything which touches another person . . . [in a manner that] offends the other person's reasonable sense of personal dignity." (quoting Maryland Civil Pattern Jury Instructions 15:2 (4th ed. 2013))).

But Strothers's only evidence for a racial motive for this conduct is that Piringer told her that Koubek favored a white candidate named Mary Blankenship for the position that the City ultimately offered to Strothers, information that led her to conclude "that it was because of my race that [Koubek] was hostile to me."  Strothers Dep. 47:6–11.  But Koubek testified in her deposition that she preferred Blankenship because she "had been working with the City for a number of years" and because she believed Blankenship to be "a better applicant."  Koubek Dep. 20:13–14, 17.  A hiring decisionmaker's preference for one candidate who happens to be white over another candidate who happens to be black, by itself, cannot support a reasonable inference of racial bias, and Koubek articulated legitimate, non-discriminatory reasons for her preference—namely, Blankenship's prior work for the City and her belief that Blankenship was a superior candidate for the position.  Strothers attempts to bolster her inferential reasoning by

offering a Declaration from Teresa Lewis, another black woman who was once supervised by Koubek. Lewis Decl., J.A. 242–43. Lewis declares that Koubek was "very rude and short-tempered" towards her and "treat[ed] other employees of color poorly" but did not "act rudely to . . . white employee[s] or treat any white employees poorly." *Id.* ¶¶ 5–6, J.A. 242. But Lewis's conclusory observations about her time working with Koubek shed little light on whether and why Strothers believed that Koubek's actions were racially motivated at the time that she complained.[3]

But even assuming that Strothers established the first element of her *prima facie* case by demonstrating that she reasonably believed that she was the victim of unlawful discrimination, Strothers has not shown a causal connection between her engagement in protected activity and her termination. "[S]ince, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in protected activity is absolutely necessary to establish the third element of the prima facie case." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998).

Strothers's complaints failed to notify the City that she was opposing conduct outlawed by Title VII rather than merely generic unfair treatment. Although her post-termination grievance specifically alleges racial harassment, Mar. 12, 2014 Grievance, J.A. 197 ("No other employee of another race, also on probation was spoken to regarding their attire . . . ."), neither of her pre-termination grievances do, *see* Jan. 9, 2014 Grievance, J.A. 157–59; Strothers Feb. 26, 2014 Memorandum, J.A. 163–65. Plainly, her post-termination grievance could not have been causally related to her release. Nor can it serve to retroactively put the City on notice that

---

[3] The City also disputes that Koubek was Strothers's supervisor as defined by *Vance v. Ball State Univ.*, 133 S. Ct. 2434 (2013). Def.'s Opp'n 25–26. But because Strothers failed to inform the City that her complaints were based on alleged race discrimination, *see infra*, it is unnecessary that I determine whether Koubek was Strothers's supervisor.

Strothers's pre-termination complaints were based on a belief that Koubek's conduct was the product of racial animus.   Strothers contends that her complaint about the leggings incident described Koubek's conduct towards her as "harassment," which she argues gave the City notice that she was complaining of unlawful discrimination.   Def.'s Opp'n 17, 20 (quoting Strothers Feb. 26, 2014 Memorandum, J.A. 165).

In my Memorandum Opinion addressing the City's Motion to Dismiss, I held that Strothers's allegation that she complained of "harassment" to superiors stated a retaliation claim for pleading purposes by reference to Fourth Circuit case law in which generalized complaints of harassment qualified as protected activity.  *Strothers v. City of Laurel, Md.*, 118 F. Supp. 3d 852, 865–66 (D. Md. 2015) (citing *Burgess v. Bowen*, 466 F. App'x 272, 282–83 (4th Cir. 2012); *Okoli v. City of Balt.*, 648 F.3d 216, 223–24 & nn. 8–9 (4th Cir. 2011)).   But, as the City correctly notes, the records in those cases contained abundant evidence that the employers either understood or should have understood that that employees were complaining of discriminatory conduct.  Def.'s Reply 6–9.

In *Okoli*, the plaintiff's supervisor propositioned her, inquired about her underwear, regaled her with stories of his past sexual exploits, fondled her leg under a table, forcibly kissed her, and asked her to sit on his lap and join him in a Jacuzzi, among other things.  648 F.3d at 217–18.  Okoli filed two complaints with superiors complaining of "harassment."  *Id.* at 218–19. Although "it might have been more ideal for [Okoli] to detail the sexual incidents," the court held that the complaints provided sufficient notice that she was complaining of unlawful discrimination because "[c]ourts and employers generally understand 'harassment' to be a term of art" and because Okoli's supervisor "based on his alleged conduct . . . surely would have known that Okoli was complaining of sexual harassment."  *Id.* at 224.  Here, the record contains

no comparable record of overt and pervasive racial harassment from which Koubek and the City could have inferred that Strothers's unadorned mention of "harassment" referred to conduct prohibited by Title VII.

In *Burgess*, Ginger Cruz supervised the plaintiff and her administrative assistant, Patricia Redmon, both black women.  466 F. App'x at 274.  When Cruz informed Burgess that she was terminating Redmon's employment, Burgess verbally told Cruz that she felt that she and Redmon were being "targeted."  *Id.* at 275.  In a follow-up email, she questioned the "fairness and equality" of the decision to terminate Redmon and requested a meeting to discuss the matter. *Id.*  In response, Cruz contacted her superior to arrange a meeting to discuss "EEO [Equal Employment Opportunity]" matters.  Although Burgess's references to being "targeted" and to a lack of "fairness and equality" did not spell out that she was complaining of racial discrimination, the court found that Cruz's reference to "EEO" matters showed that the employer "either understood, or at the very least should have understood, that Burgess was complaining of discriminatory conduct."  *Id.* at 283.  Here, Piringer's correspondence with Strothers about her complaint that followed the leggings incident evinces no comparable awareness that Strothers was complaining of racial discrimination rather than generic unfairness.  *See* Email from Peter Piringer to Felicia Strothers (Feb. 28, 2014, 1:19 P.M.), J.A. 166–67.  Indeed, Piringer apparently responded to the complaint by offering to investigate the matter, but Strothers described the investigation in follow-up correspondence as focusing on the various types of clothing that City employees wear on casual Fridays, not on discriminatory conduct.  *See* Email from Felicia Strothers to Peter Piringer (Mar. 5, 2014, 6:14 A.M.), J.A. 168 ("I thought about what you offered last night and I change [sic] my mind.  I would like you to conduct an investigation *regarding the jeans I wore* . . . . As I mentioned, several employees came to me with jeans that

were tight like leggings and looked at mine and replied, 'Those are not tight and they're not leggings, those are jeans." (emphasis added)).

Even if I assume that Strothers reasonably believed that Koubek's actions towards her were rooted in racial animus, I cannot conclude from the evidence before me that the City knew or should have known that Strothers intended to engage in protected activity by opposing conduct prohibited by Title VII.  And the City could not have terminated Strothers for engaging in protected activity if it was unaware that she intended to do so.  Accordingly, Strothers has failed to establish a *prima facie* case of retaliation, and the City is entitled to summary judgment.[4]

### Conclusion

Because Strothers has failed to provide evidence sufficient to establish a *prima facie* case of retaliation under Title VII, I will GRANT the City's Motion.  Judgment will be entered in the City's favor, and the Clerk will close the case.

A separate Order follows.


Dated: February 2, 2017                                            _____/S/_____
                                                                                Paul W. Grimm
                                                                                United States District Judge

jlb

---

[4] Strothers also argues that the City's asserted reason for terminating her employment—tardiness—was pretextual because, by the City's count, she was tardy at least 38 times prior to her termination, but the City did not give her a written warning or suspend her prior to terminating her, as its disciplinary policies dictate, and finally decided to terminate her just over a week after she filed her complaint about the leggings incident.  Pl.'s Opp'n 23–24.  I find Strothers's argument persuasive, but because she has failed to establish a *prima facie* retaliation case, it does not matter that the City has offered what appears to me to be a pretextual reason for terminating Strothers's employment.